Howey, J.,
delivered the opinion of the court:
These cases, originating under the act providing for the adjudication and payment of claims arising from the depredations of Indians, embrace but one cause of action against the defendants for the alleged taking of the property described in *281 tbe petitions wherein, if such, property was taken, John Richard, jr., concededly had an interest, but as to which there is a controversy respecting title and ownership between two representatives of the estate of John Richard, jr., one of whom resides in Wyoming and derives his authority from a court granting letters of administration there, and the other of whom resides in South Dakota and derives her authority under grant of letters of administration from a court in that State; and, likewise, a controversy between the Wyoming administrator and the person claiming as surviving partner, as to whether any person other than the original claimant had an interest and, if so, whether the proceeds arising from any judgment shall be wholly paid to such surviving partner.
For convenience, and by agreement of all parties, the cases have been consolidated and are now considered together.
Dealing with them all as one demand, the claim shown by the respective petitions is one of the few depredation claims where the Indian defendants admit the receipt of certain property and express a willingness for their annuities to be used for the payment of its reasonable value. It is true some doubt is thrown over the formal presentation of the claim in council, but the admissions are clearly made to appear from representative Ogallalas engaged in whatever taking there was. The statements were discredited by the Indian Office under the act of 1885. The claim was there presented in the name of John Richard, jr., and rejected.
Since the bar of the statute of limitations has been removed by the act of 1891 and evidence under the rules has been taken, the citizenship of the parties is established. There is no dispute respecting that of the surviving partner. As to John Richard, jr., it is established that he was born in the United States and was the son of a white father, also born in this country, and although his mother was either a full-breed or half-breed Ogallala Sioux and his wife a Sioux woman, it does not appear that there was any abandonment by Richard of his citizenship or such forfeiture of his rights as to deprive him of the benefit of the act providing for the payment of claims like this. It is shown that he rendered service to the Government in the capacity of a scout, voted and paid taxes in Laramie County, Wyo., and was a citizen of that State (then a Territory) at the time of his death. The citizenship clearly appear *282 ing, it devolves upon the defendants to show that Richard had ’ abandoned his rights as a citizen to become a member of an Indian tribe, and that they have not done.
The material question to consider is the character of the transaction out of which the claims arise. Assuming the proof to establish what it purports to establish, was there such a taking as to constitute a depredation within the meaning of the act of Congress’?
11 appears that some time in August, 1868, some merchandise and stores were purchased by claimants in the Big Horn River country at Fort O. F. Smith, then being abandoned by the Government as a military post. Just after the troops had gone and a party, consisting of the original claimant and a few others in charge of the merchandise and stores, were about to set out on their journey to the settlements in Gallatin Vallfey, in Montana, a band of Ogallala Sioux, several hundred in number, under lied Cloud as chief of the tribe, came in the vicinity of the fort where the persons in possession of the goods were at the time. The river lay between the Ogallala and the Richard party, but some of the Indians crossed below the fort and fired it.
While the fort was burning this band of Indians began to run off the stock belonging to the Richard train and also commenced to break up a lot of stoves and otherwise interfered with the property of Richard and his men. Red Cloud himself came down to the river, asked for a boat to be sent over that he might cross, and upon reaching the other side and discovering Richard, with whom he was acquainted, caused the men of his party to discontinue stampeding the stock and otherwise restrained the Indians from taking or destroying any of the property, upon the ground that Richard and some of his men were friends of his people. At the same time he demanded that certain of the goods, which included the coffee, sugar, and tobacco, and some other supplies, should be given to him, stating that these articles were needed to supply the wants of the women and children and the young men of his party. It does not appear that any actual threats were made or that any violence was resorted to for the purpose of obtaining possession of any of the property, but the goods demanded were promptly handed over. The legal condition of amity existed at the time between the defendants, resulting from the treaty of 1868, which had just been executed.
*283 We think duress is sufficiently shown to make the transaction an involuntary surrender on the part of the owners to the defendant band of such property as was actually delivered to them. Eichard and his associates were under constraint unless they were different from others similarly situated, surrounded as they were by several hundred Indians stampeding stock and burning and destroying other property. 'The circumstances were well calculated to operate on persons of ordinary firmness and to inspire a just fear of greater injury to property if not to person. It can not be doubted but that if the goods given over to the band had not been promptly delivered in response to the request for them the Indians would have possessed themselves of the goods in any event. The facts shown to exist therefore constitute a depredation.
We have given unusual consideration to this claim because of the suspicion first cast upon it by the report of the Commissioner of In diau Affairs. ■ The affidavits before the Commissioner were somewhat conflicting, but from all we can gather it is probable the quantities and values of the goods taken were exaggerated, and this, with some other circumstances relating to Eichard’s connection with the Sioux tribe, no doubt led to the report rejecting the claim. The amount demanded then was $3,923.50, which is the amount now claimed. The circumstantial evidence, considered in connection with the proof taken since this court acquired the jurisdiction, leaves but little room to doubt the good faith of the parties in presenting the claim. The demand was presented to the proper office in about three years after the taking. In 1869, it further .appears, Eichard killed a soldier at Fort Fetterman, iu Wyoming, in consequence of which he felt obliged to flee. He remained away until his offense ivas condoned. Then it was the prosecution of the claim began in the proper office. The evidence and all the circumstances preponderate'so largely in favor of the justice of the demand, we have allowed it for the fair value of the property taken in the sum. of $1,556. The measure of damage under the statute is the actual value of the property at the time and place where the depredation was committed. As there was no market at the place of this depredation, the value of the property is diminished by the cost of transportation to the market several hundred miles distant.
The partnership between the two persons from whom the *284 property was taken being established, the question arises whether the personal representatives of the deceased partner can be recognized in this proceeding.
The surviving partner is a citizen of Montana, the heirs of the deceased partner reside in South Dakota and claim through the administrator appointed there, while the administrator de bonis non lives in Wyoming and is without interest except such as grows out of his representative capacity.
The letters of administration granted in South Dakota on the estate of the deceased partner are defective on their face. They recite that the deceased at the time of his death was an inhabitant of another State. Administration granted at the place of domicile covers all the estate, wherever situated, which the administrator can reduce to possession without suit. An ancillary appointment where there are no assets is void. (King, Administrator v. The United States, 27 C. Cls. B., 529.) The letters granted in Wyoming appear to be regular, and the contest is therefore narrowed down to the two claims for the possession of the Bichard interest. The issue between the surviving partner and the Wyoming administrator thus raises a question involving the construction of the statute with respect to the character of Indian depredation claims when reduced to judgment under the act of 1891.
By the death of a partner the firm is dissolved, but the legal title to the property survives to the other to enable him to pay debts, including any balance due the surviving partner growing out of their partnership dealings. In such cases surviving partners have exclusive rights of possession and management of the firm property and business for closing the same.
The legal title may be merely a formal one, as there may be no debts, but that is a matter in any proceeding by the surviving partner that can not ordinarily be inquired into, any more than can creditors come in here and assert rights as such. In such cases remedies exist for the proper distribution of the assets, it not being our province to adjust the equities of the parties. The extent to which we may go in such cases is to afford protection to the rightful beneficiaries as well as to the Treasury, so that the persons whom it is intended shall receive the funds may do so, while the Treasury is protected against the danger of a second payment.
But it is suggested that when the deceased partner, John *285 Bichard, died there was no claim or demand known to the law against the United States or the Sioux Nation which could pass to the surviving- partner as a partnership asset.
The principle is universal that all property of the individual shall be applied to the payment of his debts except such property as may on grounds of domestic and public policy be exempt by law from such payment. Anything that shall defeat this rule or derogate from its application ought to be explicitly stated so as to enable courts to vary from the general intendment of the law with respect to the uses to which property shall be put without resort to construction on doubtful language.
If Congress had meant to exclude these claims from the general principle applicable to all claims for money, it would have said so in terms. But they have not done so by anything appearing in the early statutes upon which the claims are founded or in the jurisdictional statute, which opened the doors of this court for their adjudication as legal demands. The ninth section of the act of 1891 provides that all sales, transfers, or assignments of depredation claims, except such as have occurred in due administration of decedents’ estates, shall be void, and that all warrants in payment of judgments on such claims shall be made payable and delivered only to the claimant or his lawful heirs, executors, or administrators, or transferee under administrative proceeding. This statute is merely declaratory of the common law with respect to the assign-ability of choses in action, one of the qualities of a chose in action at common law being that it is not assignable, although in equity courts have viewed the assignment of a chose in action for a valuable consideratiou as a contract by the assignor to permit the assignee to use his name for the purpose of recovery. There is nothing, however, in this statute to exclude creditors. Thus to hold would exclude by implication the right of the surviving partner to collect and pay himself an indebtedness which arose in the course of his partnership dealings with the property, which, being taken, became a claim against the defendant Indians.
The act of 1891 (26 Stat., 851) did not create liabilities. The jurisdictional statute merely provided a method of adjudicating the claims for payment as they already existed as liabilities of the depredators. Where a depredation was com *286 mitted by Indians not identified, or where a tribe should not be found to be possessed of funds to satisfy judgment, the United States have assumed the liability of the depredators (Love v. United States 29 C. Ols. R., 332). But the liability of the principals began under the early statutes of the United States and by virtue of many of the treaties with the Indians. Under the intercourse act of 1834 the United States guaranteed eventual indemnification to the party injured, and though by the act of February 28,1859, all liabilities on the part of the United States were rescinded, the Indian liability was continued by law, and the claims were filed 'for investigation in the Indian Office not as something which in the course of time the Government might give, but as something which the Government would eventually pay as legal demands, and which the underlying promise to pay necessarily implied were legal demands pending investigation of their merits. Every appropriation, then, for the payment of a claim is not so much an act of generosity, as it is the recognition of a right and the redemption of a promise to discharge a legal obligation. It can not therefore be said that these claims when appropriated for are gratuities.
The payment of the French spoliation claims to the next of kin rests upon a proviso in the act of March 3,1891 (26 Stat., 908), which proviso contains an express limitation in favor of the next of kin instead of assignees in bankruptcy. This proviso has been held to exclude creditors, legatees, assignees, and all strangers to the blood. But in those claims this court could not render judgment, and Congress reserved the final determination in regard'to them for future consideration as to their payment. The payments contemplated were purposely brought within the category of payments by Congress by way of gratuity and grace and not otherwise. (Blacjge v. Batch, 162 U. S. R., 439). A surviving partner under the depredation act relating to Indians is a claimant within the meaning of the ninth section of said act.
The petitions of the two administrators are dismissed. Judgment will be entered in favor of Wm. S. McKenzie, surviving partner, for $1,556, but, following the precedent in the case of Lorenzo Valdez, surviving partner v. The United States (No. 3362, Ind. Dep.), all further proceedings herein are stayed until McKenzie as surviving partner shall have satisfied this *287 court that he has filed in the proper court, in the State of Montana, a bond conditioned for the faithful settlement of the affairs of the partnership existing between him and John Eichard, jr., and that he will account for any jtroceeds that may come into his hands from said judgment, to the heirs or representatives of his deceased partner, as may be ordered and directed by the court in Montana, which shall take his bond for that purpose.